UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**JANET RUTH WRIGHT**,                    Case No. 1:12 CV 1103

        Plaintiff,                    Judge John R. Adams

    v.                    REPORT AND RECOMMENDATION

**COMMISSIONER OF SOCIAL
SECURITY**,

        Defendant.                    Magistrate Judge James R. Knepp II

### INTRODUCTION

Plaintiff Janet Ruth Wright seeks judicial review of Defendant Commissioner of Social Security's decision to deny claims for disability insurance benefits (DIB) and supplemental security income (SSI). The district court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3). This case was referred to the undersigned for the filing of a Report and Recommendation pursuant to Local Rule 72.2. (Non-document entry dated May 3, 2012). For the reasons given below, the undersigned recommends affirming the Commissioner's decision.

### BACKGROUND

Procedural History

Plaintiff protectively filed for DIB and SSI on October 12, 2007, alleging disability since June 28, 2007 due to asthma, bronchitis, anxiety, and arthritis. (Tr. 142–50, 164). Her claims were denied initially and on reconsideration. (Tr. 80–85, 87–92). A hearing was held before an administrative law judge (ALJ) on May 13, 2010, at which Plaintiff, who was represented by counsel, and a vocational expert (VE) testified. (Tr. 27–75). On October 7, 2010, the ALJ issued a decision finding Plaintiff was capable of making an adjustment to jobs that existed in significant

numbers in the national economy and therefore was not disabled.  (Tr. 13–21).  When the Appeals Council denied Plaintiff's request to review the ALJ's decision (Tr. 1–5), it became the final decision of the Commissioner.[1]  20 C.F.R. §§ 416.1455 and 416.1481.

Vocational History

Plaintiff completed ninth grade before dropping out of high school at age eighteen.  (Tr. 31).  She was 50 years old at the time of her hearing.  (Tr. 31).  Her last employment was as a housekeeper at a nursing home, but she claimed the physical nature of that work caused pain in her hips, back, hands, and wrists.  (Tr. 33–34, 42).  She testified she was fired from her housekeeping position not because of any physical impairment, but because she took off work to undergo a hysterectomy and did not fill out the proper forms for the work she missed.  (Tr. 43–44).  She also testified she previously worked as a cook and cleaner in restaurants (Tr. 43) but had problems catching onto the work, stating, "I was slow, slow getting used to doing what I had to do.  It took me a while to get used to it."  (Tr. 32–33).  She also described having anxiety attacks and interpersonal problems at work, observing,  "Everybody there would say I had a bad attitude."  (Tr. 34).  She testified she has never liked having to talk to other people and being around people at work made her anxious.  (Tr. 35).

Physical Health History

On October 1, 2007, Joseph P. Spirnak, M.D., examined Plaintiff's thoracic spine and assessed mild thoracolumbar scoliotic curvature without fracture.  (Tr. 366).  On November 2, 2007,

---

[1.] Plaintiff filed another application for benefits on February 7, 2011, alleging an onset date of October 8, 2010.  In the new application, Plaintiff alleged disability due to a combination of:  (1) degenerative disc disease, facet arthritis, and scoliosis in the lumbar spine, (2) chronic pain syndrome, (3) chronic bronchitis and/or chronic obstructive pulmonary disease, (4) panic disorder, and (5) depression.  That application was approved.  (Doc. 14-1).

Nasao S. Yu, M.D., Plaintiff's primary care provider, prescribed physical therapy for her dorsal and lumbar back pain.  (Tr. 367, 611–22).  Plaintiff's December 13, 2007 lumbar spine MRI showed mild bilateral facet hypertrophy with no evidence of a herniated disc or significant stenosis.  (Tr. 426).

Plaintiff commenced treatment with John H. Gray, D.O. on January 8, 2009.  (Tr. 463).  In addition to her complaints of pain, she reported difficulty falling asleep and staying asleep for the last three months and requested a refill of Ativan.  (Tr. 463).  She had right upper quadrant tenderness and decreased grip strength, positive Romberg sign, and a mild thoracolumbar curve.  (Tr. 463).  Later that same month, Plaintiff was referred to rheumatologist Ali Malick M.D.  (Tr. 453–54).  At that time, Plaintiff reported generalized pain – especially in both her shoulders, thumbs, and hips – as well as fatigue, occasional shortness of breath, and numbness in her hands.  (Tr. 453).  Dr. Malick's assessment was shoulder pain, hip pain, degenerative joint disease, and bilateral carpal tunnel syndrome.  (Tr. 454).  Plaintiff's hip x-rays showed no significant degenerative changes.  (Tr. 456).  Finding most of Plaintiff's symptoms were secondary to degenerative joint disease or bursitis, Dr. Malick prescribed medication and gave her a shoulder injection.  (Tr. 454).

When Plaintiff next saw Dr. Malick several months later on June 17, 2009, she reported her shoulders felt good after the injections, but her left ankle and hips hurt.  (Tr. 451–52).  Dr. Malick's impression was degenerative joint disease/hip bursitis; shoulder bursitis/tendinitis (significantly resolved); thumb degenerative joint disease; and ankle sprain.  (Tr. 451).  Plaintiff's shoulder pain seemed to have resolved "markedly."  (Tr. 451).  Because he believed she had a sprain of the left ankle, Dr. Malick advised Plaintiff to avoid prolonged walking.  (Tr. 451).  The x-ray of her ankle was negative.  (Tr. 455).  Dr. Malick also noted Plaintiff had severe hip tenderness, but her hip

x-rays were normal as well. (Tr. 452). Dr. Malick gave Plaintiff an injection in her hips and Plaintiff commenced aquatic physical therapy on June 24, 2009, but was discharged when her insurance ran out. (Tr. 579–82).

On June 30, 2009, Plaintiff told Dr. Malick she still had left hip discomfort after a steroid injection, but her right hip pain was significantly resolved. (Tr. 450). She had tenderness on palpation of her left hip and mild tenderness of her right hip. (Tr. 450). She had no other red, hot, or swollen joints. (Tr. 450). Dr. Malick explained to Plaintiff that her hip, hand, and ankle x-rays were normal with no indication of degenerative joint disease. (Tr. 450). Dr. Malick adjusted Plaintiff's medications and started her on Vitamin D. (Tr. 450).

On July 28, 2009, Plaintiff told Dr. Malick her shoulders and hip felt better after an injection. (Tr. 449). On examination, Plaintiff had trigger points on the bilateral neck region and mild hip tenderness. (Tr. 449). She did not have impingement sign on her shoulders and her ankle sprain had improved. (Tr. 449). However, Dr. Malick noted she had eighteen out of eighteen fibromyalgia tender points. (Tr. 449). Overall, Plaintiff had significant improvement with her medications and bilateral shoulder injections, but still had generalized discomfort, which she described having for the past several years. (Tr. 449). Dr. Malick gave Plaintiff a trial of an antidepressant to use nightly. (Tr. 449).

On August 19, 2009, Plaintiff complained of left hip pain. (Tr. 532). Dr. Malick noted Plaintiff had done well overall on the antidepressant. (Tr. 532). On examination, Plaintiff had good range of motion in all joints of her body, although some trigger points were present on the bilateral trapezius muscle region. (Tr. 532). There was no impingement sign, but there was severe tenderness in her left hip and mild tenderness in her right hip. (Tr. 532). Dr. Malick gave Plaintiff

an injection in her left hip, increased the dosage of Plaintiff's antidepressant, and refilled her pain medication prescription. (Tr. 532).

On October 15, 2009, Dr. Malick reported Plaintiff was doing well on her medications, but she ran out of insurance. (Tr. 531). On examination, Plaintiff was sitting comfortably and had eighteen fibromyalgia tender points but no red, hot, or swollen joints. (Tr. 531). Dr. Malick continued Plaintiff's medications and recommended aquatic therapy. (Tr. 531).

Again on November 10, 2009, Plaintiff had positive fibromyalgia tender points but Dr. Malick found no red, hot, or swollen joints and she was negative for signs of impingement. (Tr. 530). Dr. Malick's impression was "fibromyalgia (improving)", and Plaintiff's overall condition was stable. (Tr. 530).

On January 5, 2010, Plaintiff reported she had recently slipped and hurt her hip. (Tr. 529). Despite this, Dr. Malick recorded that Plaintiff "steadily has been feeling much better." (Tr. 529). On examination, she only had eight out of eighteen fibromyalgia tender points. (Tr. 529). She had mild discomfort in her right hip but there were no other red, hot, or swollen joints. (Tr. 529). Overall, Plaintiff's condition was stable and her right hip discomfort was mostly secondary to a fall. (Tr. 529). In light of that, Dr. Malick noted using a walking cane as needed would help. (Tr. 529).

On March 2, 2010, Plaintiff complained to Dr. Malick of low back pain "off and on." (Tr. 528). Dr. Malick observed Plaintiff was sitting comfortably and her lumbar region showed only mild tenderness on palpation. (Tr. 528). He noted some tenderness on palpation of Plaintiff's lower thoracic region, with ten out of eighteen fibromyalgia tender points and moderate tenderness in her hips. (Tr. 528). Other than minimal degenerative changes at the L1–L2 level, Plaintiff's back x-rays were normal. (Tr. 533). Dr. Malick suggested hip injections, but Plaintiff asked to "hold that for

5

now." (Tr. 528).  Plaintiff was given a TENS unit for pain.  (Tr. 528).

On March 30, 2010, Dr. Malick evaluated Plaintiff for left hip pain.  (Tr. 527).  He found good range of motion of the bilateral elbow and shoulder region, but severe tenderness of the left hip as compared to the right.  (Tr. 527).  Plaintiff did report the TENS unit helped significantly and she told Dr. Malick she would continue using it.  (Tr. 527).  She was also given an injection in her left hip.  (Tr. 527).

When Plaintiff saw Dr. Malick on May 18, 2010, she stated, "The TENS unit belt helped my back." (Tr. 664).  Although there was a positive impingement sign for both shoulders, Plaintiff's elbow range of motion was intact.  (Tr. 664).  Dr. Malick found mild tenderness of the bilateral hips and the lower lumbar region.  (Tr. 664).  Plaintiff's straight leg raising caused only some discomfort in her back with no features of radiculopathy.  (Tr. 664).  Dr. Malick continued the TENS belt and adjusted Plaintiff's medications.  (Tr. 664).

<u>Mental Health History</u>

Plaintiff attended an initial psychiatric evaluation with Douglas J. Lee, M.D. on January 29, 2008.  (Tr. 415–16).  At that time, Plaintiff reported she had been taking Ativan for the past three years but it was not helping her.  (Tr. 415).  Dr. Lee stated "the patient does not have many issues and is only concerned about anxiety and panic attacks in certain situation[s]." (Tr. 415).  During a mental status evaluation, Dr. Lee observed Plaintiff was soft-spoken, made good eye contact, and was "only concerned about her husband, who can not find a job." (Tr. 415).  Plaintiff was calm, not crying, not agitated, and denied having withdrawal from Ativan.  (Tr. 415).  She showed no signs of anxiety or restlessness, but admitted she worried about everything.  (Tr. 415).  Dr. Lee's impression was generalized anxiety disorder and he adjusted Plaintiff's medications.  (Tr. 416).

6

Thereafter, Plaintiff saw Dr. Lee every two weeks for the next several months.  On February 11, 2008, Dr. Lee noted Plaintiff looked calmer, friendly, and she was pleasant with no complaints. (Tr. 446).  On March 10, 2008, Plaintiff had a pleasant mood, but her medication was making her tired.  (Tr. 445).  On March 24, 2008, Plaintiff was "better" with "no complaints."  (Tr. 445).  Dr. Lee's records reflect that on April 11, 2008, Plaintiff was medication compliant with no reported side effects.  (Tr. 444).  On April 25, 2008, Dr. Lee noted Plaintiff was under financial stress because she could not give her eighteen year old son a birthday gift.  (Tr. 444).  By May 9, 2008, Plaintiff started smoking again, but she was less worried and her sleep and eating were "okay."  (Tr. 443).  On June 19, 2008, Plaintiff had no complaints.  (Tr. 442).  On July 8, 2008, Plaintiff was sad because it was the anniversary of her father's death and because her husband lost his job, but she was otherwise stable.  (Tr. 441).  On July 22, 2008, Plaintiff did not want to be around people.  (Tr. 441).  On August 5, 2008, Plaintiff was shy, timid, and quiet, and Dr. Lee described her as having low self-esteem and lacking confidence.  (Tr. 440).  On October 27, 2008 and November 10, 2008, Plaintiff was sad and missing her dead father, and on November 24, 2008, she felt like she was not "good enough" and talked about avoiding people.  (Tr. 439–40).  In December 2008, she was shy and withdrawn, and on January 8, 2009, she reported poor sleep.  (Tr. 438).

The next visit with Dr. Lee appears to be a medication check on May 12, 2009.  (Tr. 514). Plaintiff presented as well-groomed with a bright affect.  (Tr. 514).  Although Plaintiff complained about pain from osteoporosis/arthritis, she reported she had a good day with her children on Mother's Day and had no complaints of medication side effects.  (Tr. 514).  She told Dr. Lee she was gaining weight, but was not on a diet or an exercise program, and she was more homebound and socially inactive.  (Tr. 514).  Dr. Lee described her condition as stable and refilled her medications.

7

(Tr. 514).

At her May 28, 2009 medication check, Plaintiff told Dr. Lee she could not find a job because she had panic attacks and "cannot go out much." (Tr. 513). On June 9, 2009, Plaintiff was worried and preoccupied about her financial issues and the future. (Tr. 512). At her July 7, 2009 and August 4, 2009 appointments with Dr. Lee, she appeared calm and somewhat relaxed. (Tr. 506, 511).

Plaintiff underwent a psychological assessment and began therapy with Sarah M. DiFilippo, M.Ed., on July 16, 2009. (Tr. 507–10). Plaintiff felt the medication prescribed by Dr. Lee was helpful, but also thought counseling would help her be more comfortable around other people. (Tr. 509). Therapist DiFilippo assessed generalized anxiety disorder and a global assessment of functioning (GAF) score of 60.[2] (Tr. 509).

On September 1, 2009, Plaintiff told Dr. Lee she felt better. (Tr. 505). On September 30, 2009, Plaintiff reported insomnia but seemed pleasant and in good spirits. (Tr. 501). Plaintiff continued counseling sessions with therapist DiFillipo in October. (Tr. 500, 502–04).

At Plaintiff's October 27, 2009 appointment with Dr. Lee, she reported she was scheduled to have a procedure to remove a breast cyst and was anxious about it. (Tr. 499). Otherwise, she was

---

2. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32–33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A higher number represents a higher level of functioning. *Id.* A GAF score of 51–60 reflects moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers). *Id.* at 32–34. As Defendant observes, this GAF is only one point lower than the next higher level of functioning, as a GAF rating between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning . . .but generally functioning pretty well . . . ." *Id.* at 34.

8

in a pleasant mood.  (Tr. 499).  At her November 24, 2009 appointment with Dr. Lee, she reported she was "down" because of the holiday season and missed her deceased father and sister.  (Tr. 557). Although she was friendly and smiling during the appointment, Plaintiff reported being very irritable and wanted to try some new medication.  (Tr. 557).  Dr. Lee obliged.  (Tr. 557).

On December 16, 2009, Plaintiff reported that with the help of her new medication, she was feeling much better and was much happier, friendlier, and more relaxed.  (Tr. 556).  She was also sleeping well and had a very pleasant affect.  (Tr. 556).  Earlier that same day, Plaintiff saw therapist DiFilippo and reported her increased medications had been helping a little.  (Tr. 555).  She had a little more energy and had been a little more active.  (Tr. 555).

On November 24, 2009, Plaintiff was positive and tried to remain hopeful, and therapist DiFilippo noted she was cooperative and talkative.  (Tr. 558).

Plaintiff had a Community Psychiatric Supportive Treatment (CPST) assessment with a social worker on December 29, 2009.  (Tr. 552).  The social worker noted Plaintiff was not interested in obtaining a job.  (Tr. 553).  She also recorded that Plaintiff demonstrated the ability to adequately maintain her household and enjoyed watching television.  (Tr. 554).

On January 12, 2010, Plaintiff saw Dr. Lee and therapist DiFilippo.  (Tr. 550–51).  Plaintiff reported to Dr. Lee that she felt much better since adding Lexapro and she had enjoyed the holidays with no complaints.  (Tr. 551).

Therapist DiFilippo's notes from a session on February 11, 2010 reflect that Plaintiff reported she was doing okay, but she had been waking up crying.  (Tr. 546).  However, she believed this was related to the anniversary of her father's death.  (Tr. 546).

When Dr. Lee saw her on February 16, 2010, Plaintiff was walking with a cane and

9

complaining about back pain.  (Tr. 543).  Despite her complaints, she was happier and had a pleasant mood.  (Tr. 543).

On March 9, 2010, Plaintiff's CPST case worker noted Plaintiff reported she had a physician complete "paperwork for JFS," but the physician wrote she was not trying during her muscle strength testing and this upset Plaintiff.  (Tr. 540).

Plaintiff saw Dr. Lee and therapist DiFilippo on March 16, 2010.  (Tr. 536, 538).  She told therapist DiFilippo she was frustrated with the occupational health person who thought she was a "liar" and exaggerated responses.  (Tr. 536).  Plaintiff told Dr. Lee she was having problems with her hip and movement and was walking with a cane.  (Tr. 538).

When Plaintiff saw Dr. Lee on April 13, 2010, she walked with a cane and appeared to be somewhat uncomfortable and slow in ambulation.  (Tr. 535).  She said she felt much better since the increase of Lexapro and appeared upbeat and in good spirits.  (Tr. 535).

Consultative Examination

On December 4, 2007, Plaintiff underwent a consultative psychological examination with Thomas F. Zeck, Ph.D.  (Tr. 379-84).  Dr. Zeck recorded that Plaintiff was applying for disability because of anxiety attacks, which she reported were getting worse.  (Tr. 379).  Plaintiff told Dr. Zeck she felt the panic attacks occurred when "she thinks too much, when she worries excessively and gets too excited and when she is around too many people."  (Tr. 379).  She reported she coped with the attacks by "walking around, putting a cold washcloth on her forehead and talking to her husband and son."  (Tr. 379).  Plaintiff also reported having arthritis and scoliosis in her back, as well as asthma and bronchitis.  (Tr. 379).

Dr. Zeck observed that Plaintiff was pleasant, but shy, and seemed to be anxious, tense, and

10

hesitant.  (Tr. 381).  He found Plaintiff had no motor or autonomic signs of anxiety, but stated she worried significantly about "everything."  (Tr. 382).

Dr. Zeck placed Plaintiff in the borderline range in terms of concentration, rote memory, immediate recall, abstract thinking, and logical thinking abilities.  (Tr. 382).  He found her mental arithmetic reasoning abilities fell in the mental defective range.  (Tr. 382).

Dr. Zeck commented, "[I]t is interesting to note that she has had a history of successful employment."  (Tr. 383).  He also noted "she tends to vacillate as to whether she feels she can or cannot work."  (Tr. 383).  Dr. Zeck's diagnoses were anxiety disorder, not otherwise specified, adjustment disorder with depressed mood, and borderline intellectual functioning.  (Tr. 383).  He assessed a GAF of 55 and a functioning GAF of 57.  (Tr. 383–84).

Dr. Zeck opined Plaintiff's ability to relate to others including fellow workers and supervisors was likely to be moderately impaired by her anxiety, depression, and lowered intellectual functioning.  (Tr. 384).  He further opined Plaintiff "had a history of being able to relate sufficiently to coworkers in the past and it is felt she could do so in terms of simple, repetitive tasks that she learned to do and were not too difficult."  (Tr. 384).  He found her ability to understand, remember, and follow instructions moderately impaired.  (Tr. 384).  However, Dr. Zeck found her capacity to maintain attendance, concentration, persistence, and pace to perform simple, repetitive tasks did not appear to be significantly impaired from an emotional standpoint.  (Tr. 384).  Finally, Plaintiff's mental ability to withstand the stress and pressure of day-to-day work activity would be only mildly impaired if the expectations were not too high.  (Tr. 384).

Reports to the Agency

On November 10, 2007, Plaintiff's primary care physician Dr. Yu completed a medical

11

source statement.  (Tr. 362–63).  Plaintiff's diagnoses reported by Dr. Yu were chronic bronchitis, anxiety disorder, and degenerative joint disease.  (Tr. 362).  He also stated Plaintiff had new complaints of dorsal and lumbar spine pain since October 2007 and was tender on palpation at her most recent visit.  (Tr. 362).  Dr. Yu noted Plaintiff's compliance was good "except [Plaintiff] continues to smoke."  (Tr. 363).  Dr. Yu opined "[Plaintiff] should be able to perform a 'low stress' job and any type of work that does not require heavy lifting or heavy physical work."  (Tr. 363).

While he was still her primary physician, Dr. Yu completed a second assessment on February 21, 2008.  (Tr. 419–23).  As of that date, he stated Plaintiff's pain was mild to moderate only at times, she had no limitation of motion of joints or spine, and had a normal gait.  (Tr. 421).  She exhibited anxiety/nervousness, but there were no significant restrictions of Plaintiff's daily activities.  (Tr. 422).  Dr. Yu explained Plaintiff had treated in his office for five years and had a good response to treatment.  (Tr. 423).  Dr. Yu further stated, "[Plaintiff] is compliant with medication, but seems to keep appointments only when she needs medication."  (Tr. 423).

On December 11, 2007, state agency psychologist Tonnie Hoyle, Psy.D. completed a Mental Residual Functional Capacity (RFC) Assessment and Psychiatric Review Technique Form.  (Tr. 386–403).  Dr. Hoyle determined Plaintiff had anxiety disorder not otherwise specified and borderline intellectual functioning (estimated).  (Tr. 393–95).  He gave weight to Dr. Zeck's findings that Plaintiff would require a low stress job and opined Plaintiff maintained the capacity to perform simple, routine tasks in a relatively static work environment that was limited to superficial interaction with others.  (Tr. 388).

On December 14, 2007, state agency physician Elizabeth Das, M.D. completed a physical RFC assessment.  (Tr. 404–11).  Dr. Das opined Plaintiff remained capable of occasionally lifting

12

or carrying 50 pounds; frequently lifting or carrying 25 pounds; standing, walking, or sitting for 6 hours in an 8-hour workday; unlimited pushing, pulling, and operation of foot controls; and could frequently stoop, crouch, or crawl; but she should avoid concentrated exposure to fumes, odors, dust and gases. (Tr. 405–08).

The ALJ Hearing

*VE Testimony*

The ALJ asked the VE a hypothetical question, assuming an individual Plaintiff's age and with a limited education who has the physical RFC the ALJ found for Plaintiff, which was essentially light work with further restrictions for exposure to breathing irritants and limiting the work to walking continuously up to five minutes at a time. This hypothetical individual was further limited by non-exertional restrictions of simple, routine tasks in a relatively static work environment limited to superficial interactions with others. (Tr. 42).

Although this hypothetical individual would not be capable of performing Plaintiff's past jobs, the VE testified she could transition to other employment, including the *Dictionary of Occupational Titles* (*DOT*) job classification of cafeteria attendant, which the VE testified exists in substantial numbers in the national and local economies. (Tr. 45). On cross-examination, Plaintiff's attorney placed considerable emphasis on the training period which could be required for the hypothetical claimant to learn the job and on the fact that while the claimant was learning this (or any) job, more than superficial interaction would likely be necessary with a supervisor or whomever was teaching the claimant the job. Through this cross examination, Plaintiff's counsel attempted to exploit the fact that virtually any job requires some period of explaining and training, and that such explaining and training necessarily amounts to more than superficial interaction as between the

13

new employee and a supervisor or trainer.  (Tr. 61–68).  The VE testified that even the simplest of jobs, in his experience, can require up to 30 days to learn.  (Tr. 62).  The VE further testified this period of learning the job would be consistent with a "superficial interaction with others" restriction included for the hypothetical claimant because "once you learn how to do the job you're on your own."  (Tr. 65).

Despite having previously testified the hypothetical claimant could perform this occupation even with the superficial interaction restriction, the VE agreed with Plaintiff's counsel that training would require more than superficial interaction with the supervisor during the training period.  (Tr. 65).  Attempting to clear up the record, the ALJ asked:

> ALJ    [O]nce you've learned the job then the interaction with others, including your coworkers and boss, would be superficial?
>
> VE     I believe so on this particular job, yes.
>
> ALJ    What would you call the interaction with the supervisor then if it wasn't superficial during the 30-day training period?
>
> \* \* \*
>
> VE     I would call it regular interaction with the supervisor.
>
> \* \* \*
>
> VE     It's basically taking the oral instruction.  That person has to be able to interact with the supervisor or instructor or boss, just taking oral[] instruction and follow[ing] the oral instruction.

(Tr. 67).

Seemingly frustrated at what he termed "a big semantic game", the ALJ modified the hypothetical individual to limit her social restriction to only superficial interactions with members of the public and inquired as to whether she would still be able to perform this job.  (Tr. 68).  The

14

VE testified he believed she could. (Tr. 68). The ALJ further attempted to resolve any potential ambiguity in the VE's testimony about interaction with the supervisor during the training period by creating yet a third hypothetical claimant. For this individual, he excepted a training period of up to 30 days, during which time she could have more than superficial contact with the supervisor. (Tr. 69). The VE confirmed the third hypothetical claimant could still perform the representative job of cafeteria attendant. (Tr. 69).

ALJ Decision

The ALJ found Plaintiff had not engaged in substantial gainful activity since June 28, 2007, the alleged onset date. (Tr. 15). He found Plaintiff had the severe impairments of bronchitis, degenerative joint disease, arthritis, fibromyalgia, and anxiety, but did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (Tr. 15–16). Upon consideration of the record, the ALJ determined Plaintiff had the RFC to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant: can walk continuously for 5 minutes at a time, up to 6 hours in an 8-hour workday; can frequently stoop, crouch, and crawl; and must avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc. In addition, the claimant maintains the capacity to perform simple, routine tasks in a relatively static work environment that is limited to superficial interactions with others, except during a 30-day training period which would require more than superficial contact with a supervisor.

(Tr. 17).

In making his determination, the ALJ considered Plaintiff's testimony concerning her alleged disability, but also noted she admitted she can do housework, attend to her personal care, prepare some meals, shop, and read. (Tr. 18). He found Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, he further found Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not

15

credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 18).

While Plaintiff alleged she became unable to work on June 28, 2007, the ALJ found evidence in the record suggests her work ended for reasons unrelated to her claimed impairments.  (Tr. 18). Specifically, the ALJ found Plaintiff left her job at Oak Hill nursing home for reasons related to her hysterectomy and that when she wished to return, there was a problem with her medical leave paperwork.  (Tr. 18).  Plaintiff then obtained another job at a different nursing home, where she worked for several days, but was terminated when she was told she could not perform the job.  (Tr. 18).

The ALJ summarized various medical findings in reaching his physical RFC determination. He found Plaintiff was treated conservatively for her low back, shoulder, and hip pain.  (Tr. 18). The ALJ summarized records pertaining to Plaintiff's degenerative joint disease, bursitis, and fibromyalgia, concluding Plaintiff's condition had responded to treatment.  (Tr. 18–19).  He found her asthma and bronchitis – while well-established in the records – were not significantly limiting, but nevertheless included a breathing irritant restriction in her RFC.  (Tr. 19).  Explaining the rationale for his mental RFC determination, the ALJ observed that at her initial psychiatric consult on January 29, 2008, Dr. Lee found Plaintiff did not like crowds and was a worrier, but did not exhibit signs of anxiety at that time.  (Tr. 19).  Dr. Lee diagnosed generalized anxiety disorder and prescribed medications.  (Tr. 19).  The ALJ noted subsequent mental health records reflect stressors including family and grief issues, as well as financial problems, but that on some visits Plaintiff was calm or feeling better, with no specific complaints.  (Tr. 19).

Additionally, the ALJ noted Dr. Zeck found Plaintiff anxious and tense, and he placed her

16

intelligence in the borderline range.  (Tr. 19).  The ALJ also relied on Dr. Zeck's observation that Plaintiff had a history of successful employment and "tends to vacillate as to whether she feels she can or cannot work."  (Tr. 19).  The ALJ referenced Dr. Zeck's GAF of 57 and incorporated Dr. Zeck's functional limitations in the RFC determination.  (Tr. 19).

Dr. Yu's two medical source statements, consistent with the RFC determination, were given "considerable" weight by the ALJ, as were the opinions of Dr. Zeck and the psychological consultant Dr. Hoyle, all of which the ALJ found "largely consistent with the longitudinal record." (Tr. 19–20).  Even though the agency physical consultants rated Plaintiff at a higher physical exertional level capacity, considering the combination of her impairments and the more recent medical evidence, the ALJ restricted her to the light exertional level, with the additional limitations set forth in the RFC.  (Tr. 20).

After finding Plaintiff unable to perform any past relevant work, the ALJ considered Plaintiff's age, education, work experience, and residual functional capacity, and found she could successfully adjust to other work.  (Tr. 20).  Because he found Plaintiff not able to perform a full range of light work due to additional limitations, the ALJ obtained VE testimony on the issue of whether jobs exist in the national economy for an individual with Plaintiff's characteristics.  The ALJ relied upon the VE's testimony that an individual of Plaintiff's age, education, work experience, and residual functional capacity would be able to perform the requirements of representative occupations such as cafeteria attendant.  (Tr. 21).  Thus, he found Plaintiff not disabled for the period from June 28, 2007 through October 7, 2010.[3]  (Tr. 21).

---

3. Plaintiff's subsequent application for benefits, which was approved, alleged an onset date of October 8, 2010, the following day.  (Doc. 14-1).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for DIB is predicated on the existence of a disability.  42 U.S.C. § 423(a).  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A).  The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was the claimant engaged in a substantial gainful activity?

2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an

18

individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can she perform past relevant work?

5. Can the claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in steps one through four.  *Walters*, 127 F.3d at 529.  The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy.  *Id.*  The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work.  *Id.*  A claimant is only determined to be disabled if she satisfies each element of the analysis, including inability to do other work, and meets the duration requirements.  20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff sets forth several issues for appeal, predominated by the assertion that the ALJ's RFC determination either was not supported by substantial evidence or failed to take additional findings into consideration.  Those contentions are addressed in turn.

Substantial Evidence Supports The RFC Determination

The RFC is the most a claimant can do despite the limitations from her physical and mental impairments.  20 C.F.R. §§ 404.1545(a) and 416.945(a).  The assessment must be based upon all of the relevant evidence, including the medical records, medical source opinions, and the individual's subjective allegations and description of her own limitations.  20 C.F.R. §§ 404.1545(a) and

19

416.945(a).  The final responsibility for determining a claimant's RFC is reserved to the Commissioner.  20 C.F.R. §§ 404.1527(d) and 416.927(d).

*Substantial Evidence Supports the Determination that Plaintiff Could Learn A New Job*

Plaintiff takes no issue with the ALJ's mental RFC determination, save what she terms an exception to the superficial interaction with others limitation.  In pertinent part, the RFC limited Plaintiff to "superficial interactions with others, *except during a 30-day training period which would require more than superficial contact with a supervisor.*"

Plaintiff complains that the ALJ "reverse engineered" the RFC to avoid the VE's testimony. (Doc. 14, at 1).  She then builds upon this premise by asserting that – without substantial evidence to do so – by excepting the 30-day training period, the ALJ attributed greater mental abilities to Plaintiff during her first 30 days of work than she would have thereafter.  (Doc. 14 at 4-5).  The undersigned disagrees.

Review of the hearing transcript and the ALJ's opinion demonstrates clearly that the ALJ determined, upon all the evidence before him, that Plaintiff was capable of performing light work with some additional restrictions.  In response to Plaintiff's counsel's cross-examination, the VE agreed virtually every job requires some instruction and training in the beginning.  (Tr. 62).  The ALJ obviously became frustrated with counsel's attempt to create ambiguity in the VE's testimony about the level of interpersonal interaction Plaintiff would need to have in order to obtain and begin a new job (as opposed to performing the job once she had mastered it).  (Tr. 68).

In making his mental RFC determination, the ALJ relied on Dr. Lee's documentation of Plaintiff's symptoms related to anxiety and dealing with people.  (Tr. 16).  He noted Dr. Zeck's finding of moderate impairment in her ability to relate to others and her complaint that she found

20

it stressful to be around others.  (Tr. 16).  The ALJ also noted the DDS consultant's finding of moderate restriction in relating to others.  (Tr. 16).  The ALJ relied upon those findings to conclude Plaintiff had the RFC to begin a new job, further noting Dr. Zeck's description of Plaintiff's history of successful employment and his GAF determination of 57.  (Tr. 19).

Plaintiff's argument in this Court that the ALJ found her mental RFC would be enhanced during the first 30 days on a new job is – as at the hearing below – a game of semantics, turning the testimony on its head.  The testimony was that the job discussed (and virtually every other unskilled job), would necessarily need to be explained to Plaintiff over a period of time.  (Tr. 62).  The VE described a training period of up to 30 days for typical unskilled jobs.  (Tr. 62).  In the VE's testimony, such training period would necessarily result in more than merely superficial interaction with a supervisor while the new employee learned the job.  (Tr. 62).  The ALJ's carve-out of a training period from the superficial interaction restriction was not, as Plaintiff argues, a finding that Plaintiff's interpersonal capacity was increased during her training for a new job.  Instead, it was merely a finding that her mental RFC could accommodate learning to perform a new occupation. "Reverse engineered" or not, it is supported by substantial evidence in the record as set forth above.

*The Physical RFC Determination Was Supported by Substantial Evidence*

Plaintiff complains that the ALJ failed to take into account her need for a cane in making his RFC determination.  (Doc. 14, at 7).  However, as Defendant properly observes, the first mention of a cane was in January 2010, when Plaintiff's rheumatologist Dr. Malick documented that Plaintiff recently "slipped and hurt her right hip" and had some discomfort in the right trochanteric bursa region "mostly secondary to a fall", further noting that using a walking cane as needed would help. (Tr. 529).  Plaintiff directs the Court to but a single other note – from her psychiatrist Dr. Lee the

following month – noting Plaintiff was walking with a cane that day.  (Tr. 543).  Indeed, the next

visit with Dr. Malick, on March 2, 2010, makes no mention of a cane.  (Tr. 528).  Thus, substantial

evidence supports the ALJ's physical RFC determination, without attributing to Plaintiff the need

for a cane.

<u>Substantial Evidence Supports the Step Five Determination</u>

*The VE Properly Testified About Jobs in the National Economy*

   In support of her argument that the VE was required to testify only about full-time jobs

existing in the national economy, Plaintiff misrepresents authority pertaining to the claimant's

capacity for  full-time, as opposed to part-time, work.  (Doc. 14, at 7–8; Doc. 16, at 2–3).  Indeed,

a district court opinion in the Sixth Circuit, cited parenthetically by Plaintiff in her Reply Brief (Doc.

16, at 3), explains away Plaintiff's assertion that the VE may not include part-time jobs in his job

incidence data:

> Finally, the Court wishes to note that [the assertion that an ALJ must specifically ask
> the VE whether his testimony refers to full-time or part-time work] has been
> addressed and rejected by the Seventh Circuit in *Liskowitz v. Astrue*, 559 F.3d 736,
> 737 (7th Cir. 2009).  The Court first explained that on its face, SSR 96-8p, 1996 SSR
> LEXIS 5 applies to the ALJ's RFC determination and not to VE testimony.  *Id.* at
> 744.  The Court then explained that the ruling does not in any way indicate that a VE
> is only permitted to testify as to the availability of full-time jobs.  *Id.*  Most
> significantly, the Court noted that there was no way for the VE to know how many
> of the identified jobs were part-time or full-time because this information is not
> contained in any government data source on which VE testimony is customarily
> based.  *Id.* at 745.  The Court then held that a VE may testify about the number of
> jobs that a claimant can perform without having to specifically indicate how many
> of those jobs are part-time.  *Id.*  The Court believes that the reasoning and decision
> reached by the Seventh Circuit in *Liskowitz* is sound.

*DeRossett v. Astrue*, 2009 U.S. Dist. LEXIS 108841 (E.D. Ky. Nov. 20, 2009).

   Plaintiff has directed the Court to no Sixth Circuit authority to the contrary, nor is the Court

aware of any.  As such, the reasoning of the *DeRossett* court, adopting the Seventh Circuit's holding

in *Liskowitz*, is adopted herein as well.

*The VE Properly Included All Restrictions in the RFC*

Plaintiff asserts the hypothetical the ALJ posed to the VE failed to account for his restriction that the hypothetical individual work in a "relatively static work environment." (Tr. 17). During cross-examination about the ALJ's first hypothetical, the following exchange took place between the VE and Plaintiff's counsel:

> Q.  All right.  And then in addition, the question was that the job had to be relatively static.  What did that mean to you as a restriction in addition to *sedentary* - -
>
> A.  I didn't hear that word from the job.

(Tr. 61) (emphasis added).

Although he sought no clarification, Plaintiff claims this must mean the VE was referring to the words "relatively static".  However, a review of the question and answer in context shows it is at least equally plausible that the VE was explaining he did not hear the word "sedentary", which would be perfectly logical because that word was *not* contained in the ALJ's hypothetical.  (Tr. 41–42).  In any event, this entire argument lacks in substance, as the ALJ quite clearly incorporated the "relatively static" restriction in each of the hypotheticals he posed, and specifically in the third hypothetical, which stated the RFC he ultimately found.

Similarly, Plaintiff's argument that the VE's testimony failed to account for the "relatively static" restriction because he agreed the cafeteria attendant job would include changes from day to day (different customers, food items, etc.) (Tr. 61), is without merit.  There can be no serious contention that the VE failed to account for the RFC and restrictions ultimately posed by the ALJ.

*The VE Testified His Opinion Was Consistent with the DOT*

23

Plaintiff argues there is a conflict between the VE's testimony and the *DOT* because light work requires more continuous walking than 5 minutes at a time, and she further argues the ALJ erred by failing to reasonably explain this conflict.  (Doc. 14, at 9).  Plaintiff did not make this contention at the hearing, nor did she cross-examine the VE on this issue.  And while Plaintiff did not waive this particular argument by failing to raise it at the hearing, "it is not without consequence."  *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008).  The ALJ certainly has an affirmative responsibility under SSR 00-4p to ask a VE if his testimony conflicts with the *DOT* prior to relying on it, *Martin v. Comm'r of Soc. Sec.*, 170 F. App'x 369, 374 (6th Cir. 2006), and the VE did so (Tr. 45).  Plaintiff's counsel asked the question again, and the VE again said his testimony was consistent with the *DOT*.  (Tr. 48).

In her Brief on the Merits, Plaintiff argues two perceived conflicts between the *DOT* description of cafeteria attendant and the hypothetical posed.  (Doc. 14, at 9–10).  Assuming without deciding that such a conflict existed, "[b]ecause [Plaintiff] did not bring the conflict to the attention of the ALJ, the ALJ did not need to explain how the conflict was resolved."  *Martin,* 170 F. App'x at 374.  Contrary to Plaintiff's arguments, the ALJ was only required to develop the record by making a further inquiry if the conflicts between the VE's testimony and the *DOT* were obvious enough that the ALJ should have identified them without any assistance, as SSR 00-4p only requires ALJs to resolve *apparent* conflicts between the VE's testimony and the *DOT*.  SSR 00-4p, 200 LEXIS 8, at *9 ("*If* the VE's . . . evidence appears to conflict with the *Dictionary of Occupational Titles*, the adjudicator will obtain a reasonable explanation for the apparent conflict."  (emphasis added)).

This Court does not believe errors in the VE's testimony were apparent in this instance, and

24

therefore the ALJ was under no obligation to investigate further.

*The Adoption of a New Ruling for Evaluation of Fibromyalgia Does Not Warrant Remand*

This "assertion", unaddressed by Defendant, consists in its entirety of a statement that the Secretary has issued a new ruling "to assist in the accurate adjudication of Fibromyalgia and its symptoms such as fatigue." (Doc. 14, at 10). Plaintiff also included an internet address where this ruling (SSR 12-2p) can be obtained. The effective date of this ruling was July 25, 2012, *see* SSR 12-2p, Evaluation of Fibromyalgia, available at https://www.federalregister.gov/articles/2012/07/25/2012-17936/social-security-ruling-ssr-12-2p -titles-ii-and-xvi-evaluation-of-fibromyalgia (last visited February 15, 2013), almost two years after the ALJ decision in Plaintiff's case, and there can therefore be no argument the ALJ erred by failing to apply a ruling that did not exist at the time he made his decision.

*The Subsequent Favorable Decision Does Not Warrant a Remand*

Plaintiff bases her last argument on the notion that a subsequent favorable decision, with an onset date the day after the decision at issue here, warrants a sentence six remand. (Doc. 14, at 17). She speculates, without more, that the subsequent favorable decision was based on new evidence of a medical expert at the hearing. (Doc. 14, at 17). Indeed, the subsequent decision makes no reference whatsoever to the medical expert's testimony upon which Plaintiff claims it was premised. (Doc. 14-1).

That Plaintiff may have received benefits on a subsequent application does not demonstrate the ALJ's decision on the application at issue here was incorrect or unsupported by substantial evidence. Under the Commissioner's regulations, each application adjudicates a discrete time period – the application's "effective filing period" – which ends when the hearing decision is issued. 20

C.F.R. § 404.620(a).

     As the Sixth Circuit has explained:

> A sentence six remand would be appropriate based on [plaintiff's] subsequent favorable decision only if the subsequent decision was supported by new and material evidence that [plaintiff] had good cause for not raising in the prior proceeding.  It is [plaintiff's] burden to make this showing under § 405(g), *see Sizemore*, 865 F.2d at 711, but he has failed to meet this burden.

*Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 653 (6th Cir. 2009).

     The only "new evidence" before the Court is the subsequent favorable decision which cannot itself constitute grounds for a sentence six remand and which, on its face, pertains to a later time period.  Plaintiff therefore fails to demonstrate she is entitled to a sentence six remand.

### CONCLUSION AND RECOMMENDATION

     Following review of the arguments presented, the record, and applicable law, this Court finds the Commissioner's decision denying benefits supported by substantial evidence.  The undersigned therefore recommends affirming the Commissioner's decision.

                                           s/James R. Knepp, II
                                   United States Magistrate Judge

     ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).